1

2

3

4

5

6                             UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
7                                        AT TACOMA

8      CHARLES MANNING, an individual,

9                          Plaintiff,

10                  v.                                     Case No. C07-5420FDB

11     STATE OF WASHINGTON DEPARTMENT                      ORDER GRANTING DEFENDANTS'
       OF CORRECTIONS, a Washington agency;               MOTION FOR PARTIAL SUMMARY
12     STAFFORD CREEK CORRECTIONS                          JUDGMENT, DISMISSING
       CENTER, a division within the Department of        FEDERAL CLAIM, AND
13     Corrections; DR. KHURSHID and JANE DOE              REMANDING REMAINING STATE
       KHURSHID, in their individual capacity and         CLAIMS TO THURSTON COUNTY
14     their marital community; MARC STEIN and            SUPERIOR COURT
       JANE DOE STEIN in their individual capacity
15     and their marital community; GRANT DEGER
       and JANE DOE DEGER, in their individual
16     capacity and their marital community;
       BELINDA STEWART and JOHN DOE
17     STEWART, in their individual capacity and
       their marital community; JOHN and JANE
18     DOES 1 – 100, unknown Health Care
       Providers and Security Persons, including
19     persons and entities working at the DOC,

20                         Defendants.

21

22          This cause of action arises from Plaintiff Manning's appearance at the Stafford Creek

23     Corrections Center medical clinic on July 6, 2004 at 6:05 a.m., which culminated in Manning being

24     diagnosed with an infection to his groin area on July 8, 2004 and being transported to the emergency

25     room by car at 9:30 a.m. for further evaluation.

26     ORDER - 1

1   Among various state claims, Manning alleges violation of 42 U.S.C. § 1983 ("deliberate

2   indifference to his serious medical needs") (Complaint V.A.,  p. 10)).  Defendants move for partial

3   summary judgment on this federal claim against all defendants.

4   **APPLICABLE LAW**

5   *SUMMARY JUDGMENT STANDARD:*  Summary judgment is proper if  the moving party

6   establishes that there are no genuine issues of material fact and it is entitled to judgment as a matter

7   of law.  Fed. R. Civ. P. 56(c).  If the moving party shows that there are no genuine issues of material

8   fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for

9   trial.  *Celotex Corp. v.  Catrett*, 477 U.S. 317, 322-323 (1986).  Inferences drawn from the facts are

10  viewed in favor of the non-moving party.  *T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d

11  626, 630-31 (9th Cir. 1987).

12  Summary judgment is proper if a defendant shows that there is no evidence supporting an

13  element essential to a plaintiff's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Failure of

14  proof as to any essential element of plaintiff's claims means that no genuine issue of material fact can

15  exist and summary judgment is mandated.  *Celotex*, 477 U.S. 317, 322-23 (1986).  The nonmoving

16  party "must do more than show there is some metaphysical doubt as to the material facts."

17  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

18  *EIGHTH AMENDMENT VIOLATIONS:*      Inmates alleging an Eighth Amendment

19  violation must demonstrate that prison officials were deliberately indifferent to their health or safety

20  by subjecting them to a substantial risk of serious harm.  *Farmer v. Brennan*, 511 U.S. 825, 834

21  (1994); *Wallis v. Baldwin*, 70 F.3d 1074, 76 (9th Cir. 1995).  Prison officials display a deliberate

22  indifference to an inmate's well-being when they consciously disregard an excessive risk of harm to

23  the inmate's health or safety.  511 U.S. at 838; 70 F.3d at 1077.  "[D]eliberate indifference entails

24  something more than mere negligence." *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997),

25  quoting *Farmer*, 511 U.S. at 835.

26  ORDER - 2

1    To prove an Eighth Amendment violation, proof of both an objective and subjective

2    component are required.  First, the deprivation alleged must objectively be sufficiently serious,

3    resulting in a denial of the "minimal civilized measures of life's necessities." *Farmer*, 511 U.S. at

4    834.  Second, the subjective component is that the prison official possesses a sufficiently culpable

5    state of mind: "deliberate indifference to inmate health and safety." *Id.* at 834-36.  If either of these

6    components is not established, a court need not inquire as to the existence of the other. *Helling v.*

7    *McKinney*, 509 U.S. 25 (1993).

8    Objective component:  "Only extreme deprivations are adequate to satisfy the objective

9    component of any Eighth Amendment claim." *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997).

10   An inmate must establish that the risk or deprivation about which he complains is "so grave that it

11   violates contemporary standards of decency to expose anyone unwillingly" to such a situation.

12   *Helling v. McKinney*. 509 U.S. 25. 36 (1993).

13   Subjective component:  The subjective test requires that a prisoner show deliberate

14   indifference on the part of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)

15   In *Wilson*, the Supreme Court surveyed earlier decisions as it examined official conduct that does not

16   purport to be a formally imposed penalty, and quoted *Whitely v. Albers*, 475 U.S. 312 (1986),

17   adding emphasis:

18       After incarceration, only the unnecessary and wanton infliction of pain ... constitutes
         cruel and unusual punishment forbidden by the Eighth Amendment.  To be cruel and
19       unusual punishment, conduct that does not purport to be punishment at all must
         involve more than ordinary lack of due care for the prisoner's interests or safety ....  It
20       is ***obduracy and wantonness, not inadvertence or error in good faith***, that
         characterize the conduct prohibited by the Cruel and Unusual punishment Clause,
21       whether that conduct occurs in connection with establishing conditions of
         confinement, supplying medical needs, or restoring official control over a tumultuous
22       cellblock.

23   *Wilson*, 501 U.S. at 298-99.   "Whether one characterizes the treatment received by [the prisoner] as

24   inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both,

25   it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle* [*v.Gamble,* 429

26   ORDER - 3

1    U.S. 97 (1976)]" *Id.* at 303.  Further elaborating upon the meaning of "deliberate indifference," the

2    Supreme Court held in  *Farmer v. Brennan*, 511 U.S. 825 (1994):

3            We hold instead that a prison official cannot be found liable under the
             Eighth Amendment for denying an inmate humane conditions of
4            confinement unless the official knows of and disregards an <u>excessive
             risk to inmate health or safety</u>; the official must both be aware of facts
5            from which the inference could be drawn that a substantial risk of
             serious harm exists, and he must also draw the inference.  The Eighth
6            Amendment does not outlaw cruel and unusual "conditions"; it
             outlaws cruel and unusual "punishments."

7

8    *Farmer*, 511 at 837 (emphasis added).

9                              **ANALYSIS AND CONCLUSION**

10          Manning argues spoliation and asserts that Defendants have intentionally destroyed evidence

11   "by deleting from the original medical record the critical fact that Charlie [Manning] declared a

12   medical emergency." (Plaintiff's response, p. 3.) Manning argues that falsification of records is

13   evidence of deliberate indifference.   Manning contends there are genuine issues of material fact

14   concerning problems with Department of Corrections policies, supervision, and training (asserting

15   "code of silence,") a policy that mandates that inmates be viewed as manipulative, and a failure to

16   train and supervise employees.  Under such conditions, argues Manning, his ability to receive

17   adequate health care was impeded by Defendants' refusal to believe that Manning had a medical

18   emergency.  Also, Manning argues that he suffered increasing harm each hour that treatment was

19   delayed.  Manning argues that while he had specifically alerted the providers that he had a medical

20   emergency, he was never given a rectal examination, and he was only treated with aspirin and

21   Benadryl, and finally, steroids.   Manning concludes that Dr. Khurshid accepted the "unfounded

22   assertion" that Robitussin caused his symptoms, did not do enough to assess Manning's condition,

23   or he understood Manning's medical needs and recklessly disregarded them.  As a result, Manning

24   asserts that he suffered the pain and indignity of losing his genitals to a flesh-eating bacteria.

25          The Court finds no evidence of spoliation.  What appears to be blocked out language on the

26   ORDER - 4

1    "kite" where Manning declares a medical emergency on July 6, 2004, simply occurred after

2    highlighting in pink then copying, resulting in a grayed out, less legible printing. (Mentzer

3    Declaration p. 2.) Nevertheless, Manning had a clearly legible version that he obtained before he

4    filed this case.

5         As to the "code of silence" assertion, Manning's citation to a finding by the Washington

6    State Personnel Board in another case is too attenuated for any such finding in this case.

7         The assertion that DOC policy mandates that inmates be viewed as manipulative must be

8    rejected as well. Manning quotes from an Ethics Manual: "In addition, offenders and their families

9    can be extremely manipulative." This statement by no means directs prison employees to view

10   inmate conduct as "extremely manipulative"; rather, it is advisory that this can happen.

11        The record reveals that in the first part of July, Manning was seeing his prison counselor,

12   James Erwick, daily to talk about what he believed to be his forthcoming release date. (Erwick

13   Decl.) Erwick noted that Manning did not appear to be well and urged him to see a doctor at the

14   infirmary. *Id.* Manning "bad mouthed" the medical staff and medical care at Stafford Creek, and

15   only wanted to talk about his release date. *Id.* Manning never asked his counsel to help him to get

16   medical assistance, nor did he ever say that he had sent "kites" that were ignored. *Id.*

17        The record further shows, and there is no serious dispute seen in the doctors' declarations,

18   that on July 1, 2004, cold medications (Chlor-Trimeton and Humabid) were ordered for Manning

19   after he reported that he had a sore throat, congestion and a cough. (Decl. Dr. Lara Strick; Decl.

20   Dr. William Yeats Duncan III) On July 2, 2004, Manning was issued Chlorpheniramine and

21   guaifensesin dm (a Robitussin equivalent) from the dispensary. (Decl. Duncan.)

22        On July 6, 2004, at 6:05 a.m., Manning presented to the medical clinic complaining of

23   swelling of his rectum and genitals. The nurse noted that the patient complained of rectal bleeding

24   with bowel movements, pain and burning with urination, and that he had a history of hemorrhoids.

25   Manning also stated that he developed a rash on his arms that started that morning of July 6, 2004.

26   ORDER - 5

1   Manning's vitals were taken and he was noted to have hives of bilateral upper extremities.  The on-

2   call provider, Physician's Assistant Certified Figueroa, was notified, and he ordered a single dose of

3   Benadryl, which was given at 6:25 a.m.  Figueroa also instructed the nurse to admit Manning to the

4   inpatient unit for observation and evaluation by the provider later that morning.  Later, Physician's

5   Assistant Certified D.B. Denison, saw Manning in the inpatient unit and noted "a swollen,

6   erythematous scrotum as well as an erythematous rash involving the trunk, arms and groin that the

7   patient stated began three days prior, which according to the note was on the same day the cold

8   medications were started."  (Doc. # 22, Strick Decl.)  The cold medications were discontinued and

9   Benadryl was ordered every four hours as needed for three days.  *Id.*   An evaluation of the urine

10   was also requested.  *Id.*

11       Manning was seen again at 8:10 a.m. when he complained of increased swelling of his

12   genital area, and it was noted that "multiple giant urticaria on [his] arms, chest and back" and

13   "smaller hives on [his] scalp, back and legs" was noted.  Vitals were obtained, and Manning was

14   instructed to drink water to help obtain a urine sample.  *Id.*

15       At 9:20 a.m., a nurse documented that the patient was complaining of a painful scrotum.

16   The urine test showed trace blood and leukocytes.  At 10:15 a.m., the nursed noted the extent of

17   the urticaria, and a one-time order for intramuscular Benadryl was given.  *Id.*

18       At 1:00 p.m., a nurse documented that Dr. Khurshid was there to see Manning and reported

19   that he was to have feldane for pain.  *Id.*

20       At 2:45 p.m., a nurse documented that the Manning had a possible allergy to Chlor-trimeton

21   and Humabid; that he was complaining of scrotal pain and an itchy rash described as "welts," and an

22   edematous, enlarged scrotum.  Vitals were taken.  The plan was for cool packs to his scrotal area as

23   needed and Benadryl as ordered.  Manning was to notify a nurse if he had any difficulty breathing or

24   if his symptoms worsened.  *Id.*

25       At 11:20 p.m., Manning's vitals were taken and he was advised to increase fluid intake.

26   ORDER - 6

1        On July 7, 2004 at 7:15 a.m., he still complained of itching and pain and swelling of his

2   scrotum.  He was told to increase fluid intake, and the provider would talk with him as soon as he

3   arrived.  (Strick Decl.)

4        At 7:30 a.m., the provider noted that Manning was hypotensive and orthostatic without

5   known history of cardiac disease and urticaria (skin condition commonly caused by allergic reaction

6   and characterized by raised red welts) over 75% of his body.  A bolus of intravenous normal saline

7   followed by an hourly infusion was ordered, as well as calamine lotion for the itching and

8   suppositories for the hemorrhoids.  Further visitations with Manning by medical staff occurred at

9   8:45 a.m.,  1:50 p.m.,  2:30 p.m.,  5:00 p.m., 1200 a.m. on July 7, 2004.  *Id.*

10       On July 8, 2004, at 7:00 a.m., Manning complained that his scrotum was swollen and hard

11  and was driving him crazy; the provider evaluated him at 7:50 a.m., noted the urticaria was

12  dramatically improved with the exception of the penis and scrotum, which had an open wound,

13  thought to be the result of the edema.  Antibiotic ointment was prescribed and treatment was to be

14  discussed with Dr. Khurshid.  *Id.*

15       At 8:50 a.m., Dr. Khurshid concluded that the patient had an infection, meperidine was

16  given at 9:00 a.m. for pain, and at 9:30 a.m., Manning was transported to the emergency room via

17  car according to the plan. *Id.*

18       The Court cannot conclude that Manning has provided evidence sufficient under the

19  standard articulated in *Farmer*. That is, (1) that the deprivation alleged –  the denial/delay of

20  medical care received at Stafford Creek – is objectively sufficiently serious, resulting in a denial of

21  the "minimal civilized measures of life's necessities"; and (2) that the prison official (here medical

22  personnel, especially Dr. Khurshid) possesses a sufficiently culpable state of mind: "deliberate

23  indifference to inmate health and safety."   This record demonstrates that medical personnel were

24  regularly being apprised of Manning's condition and adjusting their treatment.  The objective

25  component – an extreme deprivation resulting in conditions of confinement posing a substantial risk

26  ORDER - 7

1    of serious harm – of the Eighth Amendment violation test is not met under these circumstances.

2    When Manning presented with his history of hemorrhoids, and having on July 1, 2004 just started

3    cold medications, and with the complaint of swelling of his rectum and genitals and the

4    development of a rash, he was treated – he was not ignored.  The working diagnosis of an allergic

5    reaction to cold medication was reasonable under these circumstances.  His condition was closely

6    monitored, and as soon as the urticaria was found to be greatly improved except for the penis and

7    scrotum where there was an open wound, the diagnosis was changed and Manning was sent to an

8    emergency room.  Moreover, although Manning was ultimately was diagnosed with Fournier's

9    Gangrene, this is not a common condition, the bacteria causing Manning's infection – Acinetobacter

10   – is not listed among either the common or uncommon bacteria causing Fournier's (and is

11   commonly found in soil and water, and on the skin of healthy individuals) and a delay in diagnosis

12   of 5-7 days is common.  (Decl. of Lynn F. Sander, M.D.)  Manning's expert, urologist William

13   Yates Duncan III M.D.FACS explains that a perirectal abscess may lead to Fournier's Gangrene,

14   and that "Fournier's Gangrene is the terminal point in the infectious process, when the perirectal

15   abscess bursts, and the fascial borders are broken."  (Duncan Decl. ¶ 14.)  Rather than being

16   indifferent to Manning's medical problems, the staff provided him ice packs, Benadryl, calamine

17   lotion, fluids, pain medication, hemorrhoid suppositories in accordance with the diagnosis of allergic

18   reaction.  The initial onset of urticaria or hives and scrotal edema occurred at the time a new

19   medication was begun, and the most common cause of new onset urticaria is medication related.

20   (Sander Decl. ¶ 11.)  Manning asserts that he lost his genitals to the "flesh-eating bacteria," but the

21   records from Harborview Medical Center and the examination performed on August 29, 2007 by

22   John E. Keene, M.D., a urologist, prove that this is not the case: Manning's penis is "virtually

23   normal in appearance and would be very functional."  (Keene Decl., Ex. 2 p. 4.)   Manning's right

24   testicle was removed, however, owing to an intra-operative complication rather than underlying

25   disease, but loss of a single testicle does not interfere with sexual function or adequate androgenic

26   ORDER - 8

1   hormone production.  (Keene Decl., Ex. 2; Sander Decl. pp. 4-5.)    Because the record

2   demonstrates regular review and reasonable treatment to alleviate Manning's symptoms pursuant to

3   a reasonable diagnosis, it cannot be concluded that the delay or denial of treatment  about which

4   Manning complains is "so grave that it violates contemporary standards of decency to expose

5   anyone unwillingly" to such a situation. *See Helling v. McKinney*, 509 U.S. 25, 36 (1993).

6          Neither is the subjective component of the Eighth Amendment violation test met.  The

7   Supreme Court has held that "It is obduracy and wantonness, not inadvertence or error in good

8   faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause,

9   whether that conduct occurs in connection with establishing conditions of confinement, supplying

10  medical needs, or restoring official control over a tumultuous cellblock." *Wilson v. Seiter*, 501 U.S.

11  294, 298-99 (1991).  It must be shown that the official knows of and disregards an excessive risk to

12  inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  This record does not

13  reveal obduracy and wantonness.  Manning was admitted to the inpatient unit and was seen on

14  average every 2.6 hours.  (Sander Decl. p. 3.)  The medical staff arrived at a reasonable working

15  diagnosis at the time of admission. *Id.*  Manning was monitored, he was given pain medication and

16  calamine lotion for the itching about which he complained, fluids were introduced to facilitate a

17  urine sample, and he was given cold packs for his groin area.  As soon as it was determined that

18  Manning most likely had an infection, he was transported immediately to an emergency department.

19  The Court concludes that Manning has not shown "deliberate indifference" to his medical needs; on

20  the contrary, the record demonstrates otherwise.

21         Following the filing of Defendants' Reply brief on the summary judgment motion, Manning

22  filed a document entitled "Response" at Docket No. 40, which is a document entitled "Objection To

23  Declarations of Stern, Sander and Keene."  Manning contends that these declarations contain "new

24  evidence" to which Manning was unable to respond, and that he needs a three-month continuance

25  to depose these witnesses and other medical witnesses.

26  ORDER - 9

1    Manning's motion for a continuance will be denied.  Manning must understand his

2    obligations in responding with specific evidence to a motion for summary judgment.  The

3    declarations that Manning challenges were submitted to rebut assertions made by Manning in his

4    response.

5    The Director of Health Services for the Washington State Department of Corrections, Marc

6    F. Stern, M.D., explained the meaning and use of the term "medical emergency" on a "kite" as a

7    means to give inmates the ability to declare an emergency when in their opinion they have a serious

8    health problem that requires immediate attention rather than to leave the decision to security

9    personnel.  It is then up to the health care professional to use his/her training and expertise to assess

10    the patient's complaint.  Dr. Stern also explains the use of Physician Assistants.  Dr. Stern responds

11    to Manning's assertion of a "code of silence" in the Department of Corrections, noting that health

12    care professionals operate under the ethical standards of their respective professions and that they

13    are also bound to operate under the Department's and the State's ethics rules.  Dr. Stern also rebuts

14    the contention that Stafford Creek has no 24-hour access to emergency care.

15    Lynn F. Sander, M.D. is the Immediate President of the Society of Correctional Physicians.

16    Dr. Sander assessed the care given to Manning and responded to certain assertions made by

17    Manning with respect to his care.

18    John E. Keene, M.D., urologist, conducted an independent medical examination of Manning

19    and submitted his report wherein certain assertions made by Manning were rebutted.

20    These declarations were prepared and submitted in response to Manning's contrary

21    assertions; they do not constitute "new evidence."  Neither does the material in these declarations

22    raise new or unanticipated issues.  Manning has made no showing that the information was not

23    reasonably available to him when he made his response to the motion.  On the contrary, Manning

24    made specific arguments concerning the health care service provided at Stafford Creek, he made

25    assertions about the specific care he was given and indicated where he believed it fell short, and he

26    ORDER - 10

1   made assertions about the consequences of the "deliberate indifference" that he contends he

2   experienced.  Moreover, this is not a case where facts are within the exclusive knowledge of the

3   nonmoving party.  As shown by the contentions and assertions he has made, Manning has

4   knowledge of the material facts in his case.  Defendants had the burden to come forward with

5   evidence to demonstrate lack of any genuine issue of material fact as to Plaintiff's claims, and they

6   did so.  There is no showing of a need to postpone this case for further discovery.

7        There being no genuine dispute as to any material fact, and Defendants having shown that

8   they are entitled to judgment as a matter of law on the Plaintiff's federal claim pursuant to 42

9   U.S.C. § 1983,

10       NOW, THEREFORE, IT IS ORDERED:

11       1.   Construing Plaintiff's "Response" objecting to Declarations of Stern, Sander and

12            Keene [Dkt. # 40] as a motion for a continuance, it is DENIED;

13       2.   Defendants' Motion for Partial Summary Judgment on the federal claim pursuant to

14            42 U.S.C. Section 1983 [Dkt. # 20] is GRANTED and this claim is DISMISSED;

15       3.   The federal claim having been dismissed, with only state claims remaining, this Court

16            declines to exercise supplemental jurisdiction over the remaining state claims, and

17            this cause of action is REMANDED to Thurston County Superior Court.

18       DATED this 8th day of April, 2008.

19

20       _____

21       FRANKLIN D. BURGESS
         UNITED STATES DISTRICT JUDGE

22

23

24

25

26  ORDER - 11